**AGREEMENT**

**OF**

**PURCHASE AND SALE**

Between

177 Water Limited Partnership,

Seller

-AND-

ZB Pearl LLC,

Purchaser

Date:  December 18, 2020

# TABLE OF CONTENTS

Page

1.    Sale of Property ...............................................................................................1
2.    Purchase Price .................................................................................................2
3.    Deposit ............................................................................................................2
4.    Permitted Exceptions. .....................................................................................4
5.    Adjustments.....................................................................................................4
6.    Inability to Convey. ........................................................................................5
7.    Title Report .....................................................................................................6
8.    As Is ................................................................................................................6
9.    OFAC Disclosure ...........................................................................................7
10.   Removal of Fixtures. ...................................**Error! Bookmark not defined.**
11.   Violations. ......................................................................................................8
12.   Representations. ..............................................................................................8
13.   Seller's Covenants.........................................................................................10
14.   Closing Documents........................................................................................10
15.   Inspection of Real Property...........................................................................11
16.   Financing.......................................................................................................13
17.   Closing; Closing Costs; Mortgage Tax Savings. ........................................13
18.   Transfer Taxes...............................................................................................14
19.   Brokerage......................................................................................................14
20.   Notices...........................................................................................................14
21.   Assignment....................................................................................................15
22.   Personal Property ..........................................................................................16
23.   Tax Certiorari Proceedings ...........................................................................16
24.   Casualty.........................................................................................................16
25.   Condemnation. ..............................................................................................17
26.   Information Sharing.......................................................................................17
27.   Section 1031 Like-Kind Exchange ...............................................................18
28.   Confidentiality..............................................................**Error! Bookmark not defined.**
29.   Cooperation. ..................................................................................................19
30.   Indemnification Procedure............................................................................19
31.   Notice of Pendency.......................................................................................20
32.   Miscellaneous................................................................................................20
32.   Assignment of Mortgage

## LIST OF EXHIBITS

Exhibit A  -    Description of Land
Exhibit B  -    Permitted Exceptions
Exhibit C  -    Form of Deed
Exhibit D  -    Form of Bill of Sale
Exhibit E  -    Form of General Assignment and Assumption Agreement
Exhibit F  -    Form of Title Affidavit

## AGREEMENT OF PURCHASE AND SALE

This Agreement of Purchase and Sale (the "**Agreement**"), made as of December 18, 2020 (the "**Effective Date**") between 177 Water Limited Partnership, a Delaware limited partnership with an office at 50 Hudson Avenue, Brooklyn, New York 11201 (hereinafter called "**Seller**"), and ZB Pearl LLC, a New York limited liability company with an office at 225 West 37th Street, New York, NY 10018 (hereinafter called "**Purchaser**").

RECITALS:

Seller is the owner of the improved real property located at and commonly known as 53 Pearl Street, Brooklyn, New York.

Purchaser has agreed to purchase from Seller, and Seller has agreed to sell to Purchaser, the Property on the terms and conditions set forth herein.

AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants set forth herein and of other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, Seller and Purchaser hereby agree as follows:

The foregoing recitals are incorporated herein.

1. **Sale of Property**.  Seller agrees to sell and convey, and Purchaser agrees to purchase, upon the terms and conditions set forth herein:

(a)    That certain parcel of land (the "**Land**") described on Exhibit A annexed hereto and made a part hereof and more commonly known by the street address of 53 Pearl Street, Brooklyn, New York and by the Kings County Tax Map Designation of Block 30, Lot 4;

(b)    All improvements situate on the Land (the "**Improvements**");

(c)    All right, title and interest of Seller in the streets, roads, lands, and alleys in front of and adjacent to the Land;

(d)    All hereditaments and appurtenances to the Improvements and the Land, including without limitation all easements, rights-of-way, and other similar interests appertaining to the Improvements;

(e)    All machinery, equipment, fixtures and appliances of whatever nature which are affixed or attached to the Land or Improvements (the "**Fixtures**");

(f)    All appliances, equipment, furniture, fittings, tools, supplies, building materials and other similar articles of personal property not affixed or attached to the Improvements but which are used or to be used for or useable in any present or future enjoyment, occupancy or operation of the Improvements (the "**Personal Property**");

(g)    Any unpaid award for any taking by condemnation or any damage to the Land or Improvements by reason of a change of grade of any street or highway;

(h)    All site plans, architectural renderings, plans and specifications, engineering plans, as-built drawings, floor plans, and other similar plans or diagrams, if any, which relate to the Real Property (hereinafter defined) to the extent assignable by Seller; and

(i)    Seller's interest in all licenses, permits and warranties which relate to the Real Property to the extent assignable by Seller.

The items set forth in clauses (a) through (e) above shall collectively hereinafter be referred to as the "**Real Property**".  The items set forth in clauses (a) through (i) above shall collectively hereinafter be referred to as the "**Property**".  The Property shall be sold subject only to the "**Permitted Exceptions**" (as defined in Section 4 below).

2.    **Purchase Price**.  The Purchase Price for the Property is Eight Million Five Hundred Thirty-Three Thousand ($8,533,000.00) Dollars (the "**Purchase Price**").  Purchaser shall pay the Purchase Price (as adjusted pursuant to the express terms of this Agreement) to Seller at the Closing, by wire transfer of immediately available federal funds to such account(s) as Seller may designate in writing not less than one (1) business day prior to the Closing, or, at Seller's option, good unendorsed official bank check(s) drawn on a bank or trust company which is a member of the Clearing House Association (a "**New York Bank**"), and payable to the direct order of Seller, or as Seller otherwise directs.  As used herein, the term "business day" means any day other than a Saturday, Sunday or a Federal or New York State legal holiday.

3.    **Deposit**.

(a)    Within one (1) business day after the execution and delivery of this Agreement by Seller and Purchaser, Purchaser shall deliver by wire transfer to Kensington Vanguard National Land Services ("**Escrow Agent**") the amount of U.S. Eight Hundred Fifty-Three Thousand ($853,000.00) Dollars (the "**Deposit**").  Notwithstanding anything to the contrary contained herein, this Agreement shall not be binding on Seller, and Seller shall have no obligations hereunder, until Escrow Agent receives the Deposit.  If Purchaser fails to deliver the Deposit to Escrow Agent when required, this Agreement shall be null and void.

(b)    The Escrow Agent shall hold the Deposit in an interest-bearing bank account, and shall dispose of the Deposit, and any interest accrued thereon, all in accordance with the terms and provisions of the escrow agreement entered into simultaneously herewith between and among Seller, Purchaser and the Escrow Agent (the "**Escrow Agreement**").  To the extent interest is earned on the Deposit, such interest shall be paid over to the party who ultimately is entitled to receive the Deposit pursuant to the terms of this Agreement, provided, if the Closing shall occur all such interest shall accrue to the benefit of Seller but no interest earned on the Deposit shall be credited towards the Purchase Price.  The party receiving the interest shall pay any income taxes thereon.  The social security or employer identification numbers of the parties shall be furnished to Escrow Agent upon request.

(c)    If Purchaser defaults under this Agreement, the parties hereto agree that the damages that Seller will sustain as a result thereof will be substantial but will be difficult to ascertain.  Accordingly, the parties agree that in the event of such default Seller shall have the right to terminate this Agreement and (subject to the procedural requirements of the Escrow Agreement) to retain the Deposit as and for its liquidated damages and sole remedy, and upon such retention neither party shall have any further claim against the other party and this Agreement shall be of no further force and effect.  The limitation of Purchaser's liability contained in this subsection (c) shall not limit Purchaser's liability under any indemnifications given by Purchaser in this Agreement, all of which shall survive any termination of this Agreement.

(d)       Seller previously entered into an Agreement of Purchase and Sale with Pearl 53 LLC (the "**Prior Contract Vendee**") dated as of December 27, 2017 (as the same was thereafter amended, the "**Prior Contract of Sale**"), for the sale of the Property (as hereinafter defined).  Seller terminated the Prior Contract of Sale by written notice dated March 27, 2020 and retained contract deposits in the aggregate amount of $928,000.00 (the "**Prior Deposit**") funded by Prior Contract Vendee under the Original Contract.  On April 28, 2020, the Prior Contract Vendee filed a petition under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court in the Eastern District of New York (the "**Bankruptcy Court**") under Case No. 20-41911 (the "**Chapter 11 Case**").  Debtor has nominated Purchaser as the contract vendee.

(e)       If the Closing occurs, the Deposit shall be paid to Seller at Closing and the Deposit, together and a portion of the Prior Deposit in the amount of $895,000.00 (the "**Adjusted Prior Deposit**"), shall be credited against the Purchase Price.  For the avoidance of doubt, Purchaser acknowledges and agrees that only the Deposit and the Adjusted Prior Deposit (i.e. $1,748,000.00 in the aggregate) shall be credited against the Purchase Price, and the remaining portion of the Prior Deposit in the amount of $33,000.00 shall not be credited against the Purchase Price.  Purchaser acknowledges that Purchaser has no rights in or to the Prior Deposit, which has been relinquished by Prior Contract Vendee and is nonrefundable except as otherwise expressly set forth in a letter agreement between Seller and Prior Contract Vendee executed simultaneously herewith.

(f)       If the Closing does not occur due to a breach of this Agreement by Seller, the Purchaser shall have the right to either (i) terminate this Agreement and obtain a return of the Deposit, in which case the parties shall have no further liability to each other, or (ii) seek specific performance of Seller's obligations hereunder, but only if (A) Purchaser first notifies Seller in writing of its breach and Seller does not cure such breach within thirty days and (B) Purchaser commences an action for specific performance within thirty (30) days after the end of such cure period. Notwithstanding the foregoing, in the event of Seller's willful refusal to close under this Agreement or willful encumbrance of the Property (by lease or otherwise), Purchaser shall have the right to exercise any rights and remedies available under law or in equity including the right to seek specific performance. In no event shall Seller be obligated to return the Prior Deposit to Purchaser under any circumstances.

(g)       Purchaser acknowledges that Seller incurs costs and expenses relating to the Property.  To defray said costs and expenses, provided Seller is ready, willing and able to close under the Contract, Purchaser agrees, separate and apart from the Purchase Price and not as a credit against the Purchase Price, to pay to Seller the sum of Eleven Thousand Dollars ($11,000) per month (the "**Carrying Cost Charge**") on the first day of each month for the period from the date that is one hundred twenty (120) days after the Effective Date (the "**Carrying Cost Commencement Date**") through the later of Closing or the date that this Agreement is terminated and Purchaser executes and delivers an agreement confirming termination of this Agreement; provided that if the Carrying Cost Commencement Date does not occur on the first day of a calendar month, the Carrying Cost Charge for such month shall be prorated based on the number of days in such month, with such prorated amount due and payable in advance on the Carrying Cost Commencement Date.  Such payments, and any other payments made to defray carrying costs of Seller, shall not be credited against the Purchase Price.  If Purchaser fails to timely pay the Carrying Cost Charge for any month within ten (10) business days after written

notice, Seller may terminate this Agreement and retain the Deposit and the Adjusted Prior Deposit. Purchaser's obligation to pay any Carrying Cost Charges as set forth in this Section 3(g) shall survive the Closing or earlier termination of this Agreement.

4. **Permitted Exceptions**.

(a)     The Property shall be sold and conveyed subject only to those matters set forth in Exhibit B to this Agreement (collectively, the "**Permitted Exceptions**").

(b)     The existence of any mortgages, liens, claims or encumbrances which are not Permitted Exceptions shall not be grounds for an objection to title provided that properly executed instruments in recordable form necessary to satisfy the same are delivered to Purchaser at the Closing together with the required recording and/or filing fees and the Title Insurer omits the same from Purchaser's title insurance policy. Unpaid franchise or business corporation taxes of any corporations in the chain of title shall not be grounds for an objection to the condition of title provided that the Title Insurer agrees to omit the same from Purchaser's title insurance policy.

(c)     If the Property or any part thereof shall be or shall have been affected by an assessment or assessments, Seller shall remain responsible for any installments due and payable prior to the Closing and Purchaser shall be responsible for any installments or assessments due and payable on or after the Closing.

(d)     If, at the Closing, there are any liens or encumbrances on the Property which Seller is obligated by this Agreement or elects to pay and discharge, Seller may use any portion of the Purchase Price for the Property to satisfy the same, provided that the Title Insurer omits the same from Purchaser's title insurance policy.

5. **Adjustments**.

(a)     Except as otherwise specifically provided herein, Purchaser and Seller shall adjust as of midnight of the day preceding the Closing the items hereinafter set forth. If any such items are not determinable at the Closing, the adjustment shall be made subsequent to the Closing when the amount is determined. Any errors or omissions in computing adjustments at the Closing shall be promptly corrected. The obligations set forth in this Section 5 shall survive the Closing. Except as otherwise specifically provided for herein, all adjustments shall be made in the manner recommended by the Customs in Respect to Title Closings of the Real Estate Board of New York, Inc., and there shall be no other adjustments. The items to be adjusted are:

(i)     Real estate taxes and business improvement district charges (if any) on the basis of the fiscal period for which assessed. If the Closing shall occur before the tax rate is fixed, the apportionment of taxes shall be upon the basis of the tax rate for the next preceding fiscal period applied to the latest assessed valuation. Promptly after the new tax rate is fixed, the apportionment of real estate taxes shall be recomputed. If Seller has made an overpayment of real estate taxes for the New York City fiscal year in which Closing occurs or any earlier fiscal year and any portion of the overpayment is credited towards payment of real estate taxes for the Real Property for subsequent fiscal years rather than being refunded to Seller, an appropriate adjustment shall be made at Closing in favor of Seller for its right, title and interest in such credit;

(ii)      Water rates, water meter charges and sewer rents, if any, on the basis of the fiscal period for which assessed;

(iii)      Fuel oil, if any, on the basis of Seller's last cost therefor, including sales tax, as evidenced by a written statement of Seller's fuel oil supplier dated within seven (7) business days of the Closing, which statement shall be conclusive as to quantity and cost;

(iv)      Intentionally omitted;

(v)      Charges for all electricity, steam, gas and other utility services (collectively, "**Utilities**") shall be billed to Seller's account up to the Apportionment Date and, from and after the Apportionment Date, all Utilities shall be billed to Purchaser's account. If for any reason such changeover in billing is not practicable as of the Closing Date (as defined in Section 17(a)) as to any Utility, such Utility shall be apportioned on the basis of actual current readings or, if such readings have not been made, on the basis of the most recent bills that are available. If any apportionment is not based on an actual current reading, then upon the taking of a subsequent actual reading, the parties shall, within ten (10) business days following notice of the determination of such actual reading, readjust such apportionment and Seller shall promptly deliver to Purchaser, or Purchaser shall promptly deliver to Seller, as the case may be, the amount determined to be due upon such adjustment.

(vi)      Any other item which, under the express terms of this Agreement, is to be apportioned at the Closing.

(vii)      Carrying Cost Charges for the month in which the Closing occurs if the Closing occurs after the Carrying Cost Commencement Date.

(b)      At the Closing, the net adjustment pursuant to this <u>Section 5</u> shall be paid (i) if in favor of Seller, in the same manner as set forth in <u>Section 2</u> of this Agreement or (ii) if in favor of Purchaser, as a credit against the Purchase Price payable pursuant to <u>Section 2</u> of this Agreement.

(c)      Seller shall prepare and submit to Purchaser for Purchaser's reasonable approval at least three (3) business days prior to the Closing a preliminary closing statement. Seller and Purchaser shall use their best efforts to expeditiously agree upon a final closing statement (the "**Closing Statement**") prior to Closing.  Each of the parties shall act reasonably and in good faith in preparing the Closing Statement, and Seller shall provide reasonably satisfactory backup for the items in the Closing Statement. The Closing Statement, once agreed upon, shall be signed by Purchaser and Seller and delivered to the other party.  The preliminary proration shall be paid at Closing by Purchaser to Seller (if the preliminary prorations result in a net credit to Seller) or by Seller to Purchaser (if the preliminary prorations result in a net credit to Purchaser) by increasing or reducing the cash to be delivered by Purchaser in payment of the Purchase Price at the Closing.  The parties hereto agree that any errors or omissions in computing apportionments at the Closing shall be corrected promptly after they are discovered, which obligation shall survive the Closing for a period of three months.

6.  **<u>Inability to Convey</u>**.

Subject to <u>subsection (b)</u> of this <u>Section 6</u>, if Seller shall be unable to convey title to the Property subject only to the Permitted Exceptions, and Purchaser shall be unwilling to (1) waive objection to each lien, claim, encumbrance or exception which is not a Permitted Exception (a "**Title**

**Defect**") and (2) close this transaction without (x) abatement of the Purchase Price, (y) credit or allowance of any kind or (z) any claim or right of action against Seller for damages or otherwise, Seller shall have the right, at Seller's sole election, to either (i) take such action as Seller shall deem advisable to remove, remedy or comply with each such Title Defect or (ii) terminate this Agreement.  If Seller shall elect to take action to remove, remedy or comply with each such Title Defect, Seller shall be entitled to one of the Closing for a period not to exceed thirty (30) days in the aggregate, and the Closing shall be adjourned to a date specified by Seller not beyond such thirty (30) day period.  If, for any reason whatsoever, Seller shall not have succeeded in removing, remedying or complying with each such Title Defect at the expiration of such adjournment, Purchaser may, within five (5) days after the expiration of the last of such adjournments, give notice to Seller that Purchaser is willing to waive objection to each such Title Defect and to close this transaction without abatement of the Purchase Price, credit or allowance of any kind or any claim or right of action against Seller for damages or otherwise.  If Purchaser does not give such notice, this Agreement shall be deemed to be terminated as of the last adjourned date of the Closing.  Upon any termination of this Agreement pursuant to this subsection (a), Purchaser shall be entitled only to a return of the Deposit, but not the Prior Deposit, and Seller shall have no obligation or liability to Purchaser for any damages that Purchaser may have sustained by reason of Seller's inability to convey title in accordance with the terms of this Agreement.  No action taken by Seller to remove, remedy or comply with or attempt to remove, remedy or comply with any purported lien, claim, encumbrance or exception shall be an admission that any such purported lien, claim, encumbrance or exception is not a Permitted Exception.  Notwithstanding anything to the contract set forth in this Agreement, at or prior to Closing, Seller shall (i) satisfy all mortgages encumbering the Property, (ii) discharge all liens affecting the Property, other than liens arising from acts of Purchaser or its members, managers, agents, contractors or consultants, (iii) discharge all judgments affecting the Property in a liquidated amount and (iv) cause to be terminated all easements, covenants, conditions or restrictions affecting title to the Property which were granted or created by Seller after the date hereof.

The acceptance of the deed set forth in Section 13 hereof shall be deemed to be full performance and discharge of every agreement, covenant and obligation on Seller's part to be performed under this Agreement, and no such agreement, covenant or obligation of Seller shall survive acceptance of the deed, except for those which this Agreement expressly provides shall survive the Closing.

7.  **Title Report**.  Within five (5) days after the Effective Date, Purchaser shall order a title report for the Property from Kensington Vanguard National Land Services (the "**Title Insurer**").  Upon receipt thereof, Purchaser shall forward a true copy of the title report to Seller's attorneys, Tarter Krinsky & Drogin LLP, 1350 Broadway, New York, New York 10018, Attention: William W. Weisner, Esq. Such title report shall constitute notice of all objections and other contents set forth therein.  Purchaser shall instruct the Title Insurer, in writing, to furnish copies of all title continuations to Seller's counsel at the address set forth above simultaneously with the delivery thereof to Purchaser.

8.  **As Is**.  Purchaser acknowledges that it has inspected the Property, is familiar with the physical condition thereof, and is purchasing the Property "as is", "where is" and "with all faults" on the date hereof, subject to reasonable use, wear, tear and natural deterioration between the date hereof and the Closing.  The foregoing notwithstanding, Seller shall have no

obligation to make repairs to or maintain the Improvements to the extent the need for such repairs or maintenance arises as the result of the negligent acts of Purchaser or its officers, employees, contractors or agents.  This Agreement, as written, contains all the terms of the agreement between the parties, and Purchaser acknowledges that Seller has made no representations and held out no inducements to Purchaser other than those herein expressed.  Without limiting the generality of the foregoing, Purchaser has not relied on any representations or warranties not expressly set forth herein, and Seller has not made any representations or warranties other than as expressly set forth herein, in either case express or implied, as to any matter, including without limitation (i) the current or future real estate tax liability, assessment or valuation of the Property, (ii) the environmental condition of the Property or the presence or absence of any hazardous materials, (iii) the availability of any financing for the purchase, alteration, rehabilitation or operation of the Property from any source, (iv) the present and future condition and operating state of any and all machinery or equipment on the Property and the present or future structural and physical condition of any building or its suitability for rehabilitation or renovation, (v) the ownership or state of title of any Personal Property, and (vi) the compliance of the Property with laws, ordinances, rules or regulations issued by any governmental authority, agency or board, including without limitation environmental laws, zoning resolutions, building codes, rent regulations, and interim multiple dwelling laws, (vii) the legality of any rents formerly charged to tenants of the Property or the accuracy of any filings with the DHCR or any other governmental agency or authority, or what laws, codes or regulations governing rights of tenants or other occupants (or former tenants or occupants) do or do not apply to the Property, or (viii) the permitted uses of the Property.  Seller is not liable or bound to Purchaser in any manner by any verbal or written statements pertaining to the Property or the operation, layout, expenses, condition, income, leases, rents, agreements, licenses, easements, instruments, documents or service contracts furnished by any real estate broker, agent, employee or other person

9. **OFAC Disclosure**.  Purchaser is not a person and/or entity with whom Seller is restricted from doing business under the Internal Emergency Economic Powers Act, 50 U.S.C. Section 1701 et seq.; the Trading With The Enemy Act, 50 U.S.C. App. Section 5; the U.S.A. Patriot Act of 2001; any executive orders promulgated thereunder, any implementing regulations promulgated thereunder by the U.S. Department of Treasury Office of Foreign Assets Control ("**OFAC**") (including those persons and/or entities named on OFAC's List of Specially Designated Nationals and Blocked Persons); or any other applicable law of the United States.  Neither Purchaser nor any person and/or entity who owns an interest in Purchaser is now nor shall be at any time prior to or at the Closing a person and/or entity with whom a U.S. person and/or entity, including a financial institution, is prohibited from transacting business of the type contemplated by this Agreement, whether such prohibition arises under United States law, regulation, executive orders and lists published by OFAC (including those executive orders and lists published by OFAC with respect to Specially Designated Nationals and Blocked Persons) or otherwise.

10. **Removal of Fixtures**.   Prior to the Closing, Seller shall remove the refrigerators, stoves and bathtubs (if any) from Unit numbers 2R, 3F, and 3R, and, if applicable, cap the gas lines to such stoves and cement the pipes leading to/from the bathtubs, and request an inspection by the Loft Board, all at Purchaser's expense.  Purchaser acknowledges that Seller will need to obtain a permit in order to perform the plumbing work, and signoffs upon completion of certain aspects of the work.  Seller shall have no obligation to complete any

portion of the work that cannot be completed because (i) Seller is unable to obtain any permits because of the existence of the open permit application described in Section 11 below, (ii) the existence of any violations, (iii) the closure of (or limitation of services available at) the NYC Department of Buildings due to the Covid-19 pandemic, (iv) any law, rule, executive order or other directive issued by any Federal, State or local government, official, or agency, (v) Seller's inability to obtain a Letter of No Objection to the work from the Loft Board or (vi) any other reason beyond Seller's reasonable control.  Purchaser shall advance to Seller Seller's reasonable out-of-pocket funds to pay the cost of such work (and any related fees for disposal of the fixtures) within ten days of receipt from Seller of a proposal for such work obtained by Seller.  If Purchaser fails to do so, Seller shall have no further obligation to perform such work.  Seller is not required to, and Purchaser shall not, submit any documentation to the Loft Board for removal of the Units in the Property and the Property itself from the jurisdiction of the Loft Board.  Purchaser shall reimburse Seller for all costs incurred by Seller under this Section 10 (excluding costs fully covered by advances previously made by Purchaser) within ten days of Purchaser's receipt of any invoices therefor.  Purchaser's obligations under this Agreement are not in any way conditioned upon removal of the Units in the Property and the Property itself from the jurisdiction (if any) of the Loft Board, or upon completion of any of the work described in the first sentence of this Section 10 to the extent excused under the third sentence of this Section 10.

11. **Violations**.  Seller shall not be required to remove, comply with, clear of record or pay the costs or amounts required to clear or remove of record any violations or alleged violations of laws, codes or regulations, and no existing or future violations (including without limitation any arising as a result of Seller's performance of its obligations under Section 10 above) shall be an objection to title or to closing.  Purchaser shall accept the Property subject to all such violations and without a Certificate of Occupancy, without abatement against the Purchase Price, credit or allowance of any kind or any claim or right of action against Seller for damages or otherwise, other than a $25,000 credit to be applied against the Purchase Price at the Closing.  Purchaser acknowledges that there is no certificate of occupancy for the Property and Seller is not obligated under this Agreement to obtain a certificate of occupancy as a condition to the Closing or otherwise.  Seller shall cooperate with Purchaser, at Purchaser's expense, in Purchaser's efforts to withdraw the Alt-1 application filed on behalf of Seller on August 21, 2013 as Job No. 320577050 (which was disapproved on December 18, 2013), provided that (i) Purchaser shall pay (or at Seller's request, advance) any third party out-of-pocket professional fees incurred by Seller in connection therewith, within ten days of Purchaser's receipt of any invoices therefor, and (ii) Seller shall not be required to perform any work in connection therewith.  Purchaser's obligations under this Agreement are not in any way conditioned upon such withdrawal being accomplished.

12. **Representations**.

(a)  Seller represents and warrants to Purchaser, and Seller and Purchaser covenant and agree, that:

(i)  the Property shall be delivered vacant and free of all leases, tenancies and occupants;

(ii)  Seller has not entered into any leases or other occupancy agreements, nor has any tenant or other occupant occupied the Property, from and after the vacatur of each apartment by the most recent occupant thereof, the last of whom vacated his/her

apartment on or before December 31, 2018 (and not less than the period after the ninetieth (90th) day prior to the Effective Date);

(iii)    As of the date hereof, Seller has received no written notice of any actions, suits or proceedings pending or threatened against the Property, at law or in equity, before any federal, state, municipal or governmental department, commission, board, bureau, agency or instrumentality which would in any way affect the Property other than the Chapter 11 Case;

(iv)    As of the date hereof, Seller has received no written notice of any pending or threatened condemnation or eminent domain proceedings that would affect any part of the Property;

(v)    Seller represents and warrants to Purchaser that Seller is a limited partnership duly organized and validly existing under the laws of the State of Delaware and has the power to enter into the transactions contemplated by this Agreement and to execute any and all documents to effectuate same, (ii) the transactions contemplated by this Agreement do not violate any applicable provisions of the charter, by-laws, partnership agreement, operating agreement, or other documents creating, governing or affecting Seller, (iii) shareholder/partner/member approval of the transactions contemplated by this Agreement has either been obtained or is not required, (iv) this Agreement and any and all other documents executed in connection with the transactions contemplated herein, when executed, will constitute valid and binding obligations of Seller and will be enforceable in accordance with their respective terms, and (v) neither Seller nor any principal thereof is listed on the Specially Designated Nationals and Blocked Persons list maintained by the Office of Foreign Assets Control, Department of the Treasury or is under investigation by any governmental authority for (or has been charged with or convicted of) violating any antiterrorism or anti-money laundering laws, orders, rules or regulations, or has been notified that any of its or their assets have been "frozen" by any governmental authority;

(vi)    Seller is not a foreign person and is a "United States Person" as such term is defined in Section 7701(a)(30) of the Internal Revenue Code of 1986, as amended (the "**Code**"); and

(vii)    there are no service contracts affecting the Property and Seller shall not enter into any service contract after the Effective Date.

The representations contained in this Section 12(a) shall survive the Closing for a period of six (6) months.

(b)    Purchaser represents and warrants to Seller that (i) Purchaser is a limited liability company duly organized and validly existing under the laws of the State of New York and has the power to enter into the transactions contemplated by this Agreement and to execute any and all documents to effectuate same, (ii) the transactions contemplated by this Agreement do not violate any applicable provisions of the charter, by-laws, partnership agreement, operating agreement, or other documents creating, governing or affecting Purchaser, (iii) shareholder/partner/member approval of the transactions contemplated by this Agreement has either been obtained or is not required, (iv) this Agreement and any and all other documents executed in connection with the transactions contemplated herein, when executed, will constitute

valid and binding obligations of Purchaser and will be enforceable in accordance with their respective terms, (v) neither Purchaser nor any principal thereof is listed on the Specially Designated Nationals and Blocked Persons list maintained by the Office of Foreign Assets Control, Department of the Treasury or is under investigation by any governmental authority for (or has been charged with or convicted of) violating any antiterrorism or anti-money laundering laws, orders, rules or regulations, or has been notified that any of its or their assets have been "frozen" by any governmental authority, (vi) the Prior Contract Vendee and/or its members only have a passive, non-voting ownership interest in the Purchaser entity based on a capital account basis in the total amount of the Prior Deposit, (vii) Danny Zelouf and/or Jason Behfarin, or members of their immediate family or trusts for the benefit thereof, have an ownership interest in the Purchaser entity of not less than 33.33% and have full control of the operation and management of the Purchaser entity.

(c)     If on or before the Closing Purchaser becomes aware that any representation made by Seller in this <u>Section 12</u> is inaccurate, Purchaser shall have the right to either (x) terminate this Agreement and thereupon obtain a return of the Deposit, but not the Prior Deposit, and Seller shall have no obligation or liability to Purchaser for any damage that Purchaser may have sustained by reason of such misrepresentation as set forth above, or (y) seek any remedies available at law or in equity including, without limitation, specific performance.

(d)     All representations contained in this <u>Section 12</u> shall be deemed repeated at the Closing and shall be deemed made anew effective as of the Closing. Thereafter only those representations which Purchaser (i) alleges in a written notice given to Seller within said six (6) month period that Seller has breached and (ii) commences an action for damages in a court of competent jurisdiction within sixty (60) days after the end of said six (6) month period, and diligently prosecutes same to completion at all times thereafter, shall survive.

13. **Seller's Covenants**. Between the date hereof and the Closing, Seller:

(a) shall not enter into any new contract, license or agreement relating to the Real Property unless same is cancelable upon not more than thirty (30) days' notice;

(b) shall keep all insurance policies covering or relating to the Real Property in full force and effect up to and including the Closing, or provide comparable replacement coverage;

(c) shall not enter into any new lease or other agreement to let space in the Improvements;

(d) shall not sell, assign, or otherwise transfer any air or development rights in the Real Property; and

(e) shall not submit any application relating to zoning, rezoning or other land use matter for the Real Property.

14. **Closing Documents**.

(a)     At the Closing, Seller shall deliver (or shall cause to be delivered) the following documents (collectively, the "**Seller's Closing Documents**"):

(i)     a duly executed counterpart of a Bargain and Sale Deed without Covenant Against Grantor's Acts, substantially in the form of <u>Exhibit C</u> attached hereto;

{Client/084986/2/02234181.DOC;7 }

(ii)     a duly executed counterpart of a Bill of Sale, substantially in the form of Exhibit D attached hereto;

(iii)     a duly executed counterpart of an General Assignment and Assumption Agreement (the "**General Assignment**"), substantially in the form of Exhibit E attached hereto;

(iv)     a certification, pursuant to Section 1445 of the Internal Revenue Code, that Seller is not a "**foreign person**" within the meaning of said Section;

(v)     the Closing Statement described in subsection 5(c) hereof;

(vi)     transfer tax returns and statements described in Section 18 hereof, together with certified checks to the order of the Title Insurer or the appropriate officers in payment of applicable transfer taxes (unless Seller elects to have the Title Insurer pay them from the net proceeds to be paid to Seller at the Closing as part of the Purchase Price);

(vii)     a duly executed title affidavit, substantially in the form of Exhibit F attached hereto or as otherwise reasonably requested by the Title Insurer;

(viii)     keys to the Improvements in possession of Seller or its agents;

(ix)     a certified copy of Seller's duly executed resolutions authorizing the execution of this Agreement, all documents required to be executed and delivered by Seller in connection therewith and the consummation of the transactions contemplated by this Agreement; and

(x)     Such other instruments or documents which by the terms of this Agreement are to be delivered by Seller at Closing.

(b)     At the Closing, Purchaser shall deliver or cause to be delivered the following documents (collectively, the "**Purchaser's Closing Documents**"):

(i)     The balance of the Purchase Price plus or minus the prorations pursuant to Section 5;

(ii)     a certified copy of Purchaser's duly executed resolutions authorizing the execution of this Agreement, all documents required to be executed and delivered by Purchaser in connection therewith and the consummation of the transactions contemplated by the foregoing;

(iii)     executed counterparts of the transfer tax returns and statements described in Section 18 hereof;

(iv)     a copy of the executed General Assignment;

(v)     the Closing Statement; and

(vi)     such other instruments or documents which by the terms of this Agreement are to be delivered by Purchaser at the Closing.

15. **Inspection of the Real Property**.

(a)     Seller hereby grants to Purchaser the right, up to and including the Closing Date or earlier termination of this Agreement, to enter onto the Land from time to time to examine and inspect the Land, and to make non-invasive environmental, engineering and other

tests, appraisals and such other studies as are deemed necessary or desirable by Purchaser. Seller shall not unreasonably withhold consent to the performance by Purchaser of probes of walls, ceilings, and floors (limited to three (3) locations) solely in connection with elevator studies being performed by Purchaser or as otherwise consented to by Seller (such probes to be performed by a licensed engineer). Purchaser's right to make such probes shall be conditioned upon the following: (i) the probes shall be performed by a licensed engineer, and shall be completed no later than March 15, 2021; (ii) the probes shall be scheduled in advance with Seller and Seller shall have the right to have a representative of Seller present; (iii) Purchaser shall provide evidence to Seller that the insurance required under Section 15(c) is in place and Seller has been named as an additional insured; (iv) Purchaser shall repair and restore all affected areas to Seller's reasonable satisfaction prior to Closing and (v) Purchaser shall pay all reasonable out-of-pocket expenses incurred by Seller in connection with review and supervision of the probes within ten days of Purchaser's receipt of any invoices therefor. Purchaser's obligations under this Agreement are not in any way conditioned upon Purchaser's satisfaction with the results of any such studies.

(b)　　　Purchaser shall provide not less than two (2) business days' prior notice to Seller of any entry. Seller may require a representative of Seller to be present at all times. All inspections shall be accomplished in an expeditious, safe and diligent manner in accordance with all applicable laws. Purchaser shall repair, at its sole cost and expense, any damage caused by Purchaser. Purchaser shall promptly deliver to Seller copies of all data, information and reports generated by or for Purchaser relating to the results of inspections of the Real Property.

(c)　　　As a condition to entry onto the Real Property for purposes of performing any intrusive inspection such as the elevator study probes, Purchaser and any contractor or consultant engaged by Purchaser who desires to enter upon the Real Property provide evidence that it maintains (i) commercial general liability insurance (including personal injury liability coverage) with a minimum per occurrence limit of at least $1,000,000.00 and general aggregate limit of $2,000,000.00, (ii) automobile liability insurance covering owned, hired and non-owned vehicles, providing coverage of $1,000,000.00 combined single limit for bodily injury and property damages, and (iii) workers compensation insurance (in statutory amounts) and employers' liability insurance coverage of $1,000,000.00 on an occurrence basis. Seller shall be named as an additional insured (except under workers' compensation insurance) on all policies and such policies shall be considered primary insurance without recourse to or contribution from any similar insurance carried by Seller. Any loss at the Real Property insured under the Purchaser's property insurance shall be adjusted by and payable to Seller. All insurance certificates obtained by the Purchaser shall contain a provision that coverages afforded under the policies evidenced by such certificates will not be canceled without thirty (30) days prior written notice to the Seller. Purchaser and its contractors shall deliver certificates of insurance to Seller naming Seller as an additional insured prior to entering upon the Real Property. All liability insurance required to be carried by Purchaser and its contractors shall contain broad form contractual liability insurance coverage insuring their respective indemnity obligations to Seller pursuant to this Agreement.

(d)　　　Purchaser shall promptly notify Seller of any loss, damage, injury or death arising out of or in connection with any of its inspections or related activities at or near the Real Property. Unless caused by Seller's negligence or willful misconduct, Purchaser shall defend, indemnify and hold Seller and its affiliates, officers, members, managers, directors, shareholders,

employees and agents (collectively the "**Indemnified Parties**") harmless from any claims, losses, suits and expenses (including reasonable attorneys' fees) which the Seller Indemnified Parties may incur as a result of any damage to person or property caused by Purchaser's entries upon and examinations of the Land.  This indemnification shall survive any termination of this Agreement.

(e)      Notwithstanding anything in this Agreement to the contrary, Purchaser shall have no right to terminate this Agreement based on Purchaser's inspection of the Property. Purchaser shall not, directly or through an agent or other representative, send notices to, contact or otherwise communicate with former tenants of the Property.

16. **Financing**.  The obligations of Purchaser hereunder are **not** in any way conditioned upon or qualified by Purchaser's ability to obtain financing of any type or nature whatsoever (i.e., whether by way of debt financing, equity investment, or otherwise) to consummate the transaction contemplated hereby.

17. **Closing; Closing Costs; Mortgage Tax Savings**.

(a)      The Seller's Closing Documents and the Purchaser's Closing Documents shall be delivered, together with payment of the Purchase Price, at the closing (the "**Closing**"), which shall be held at the offices of Tarter Krinsky & Drogin LLP, 1350 Broadway, New York, New York 10018, or, at Seller's option, by escrow through the Title Insurer on the date that is the later of the date that is (i) ninety (90) days after the Effective Date, or (ii) ten (10) days after confirmation of a plan of reorganization by the Bankruptcy Court in connection with the Prior Contract Vendee's Chapter 11 Case (the "**Plan Approval**"), which Plan Approval provides for the ratification and approval of the purchase and sale of the Property contemplated by this Agreement, *provided*, *however*, in the event the Plan Approval does not occur on or before the date that is one hundred twenty (120) days after the Effective Date (the "**Plan Approval Deadline**"), the Closing shall occur on or before the date that is thirty (30) days after the Plan Approval Deadline. Notwithstanding the foregoing,

(i)      Purchaser shall have the right to extend the Closing Date for a period of up to thirty (30) days upon written notice to Seller, provided that Purchaser pays the Carrying Cost Charges pursuant to Section 3(g) hereof; and

(ii)      Purchaser shall also have the right to extend the Closing for an additional period of up to  sixty (60) days beyond the date of Closing established pursuant to the preceding provisions of this Section (including Section 17(a)(i) above), upon and subject to the following terms and conditions:  (1) Purchaser shall  give written  notice to Seller of such extension (the "**Extension Notice**") at least three business days prior to the then scheduled date of the Closing, (2) Purchaser shall continue to pay the Carrying Cost Charges to Seller pursuant to Section 3(g) hereof (provided that commencing on the first day of such sixty day period, the Carrying Cost Charges shall accrue at the rate of $13,000 per month rather than $11,00 per month) and (3) within two business days of giving the Extension Notice, Seller shall wire transfer to the Escrow Agent an additional deposit in the amount of $250,000 (the "**Extension Deposit**").  The Extension Deposit shall be considered part of the Deposit for all purposes of this Agreement.  If Seller fails to timely pay the Extension Deposit to Escrow Agent, the Extension Notice shall be null and void. The date on which the Closing shall occur is herein called the "**Closing Date**".

(b)    Except as expressly provided in this Agreement, each party shall bear its own costs and expenses, including attorney, accountant and other consultant fees, in connection with the execution and negotiation of this Agreement and the consummation of the transactions contemplated hereby.  Purchaser shall pay the cost of recording the Deed.

18. **Transfer Taxes**.  Except if exempted in connection with the Prior Contract Vendee's Chapter 11 Case, Seller shall pay at the Closing the New York State Real Estate Transfer Tax, in accordance with Article 31 of the Tax Law and the New York City Real Property Transfer Tax imposed by Title II of Chapter 46 of the Administrative Code of the City of New York.  Seller and Purchaser shall each execute and/or swear to the returns or statements required in connection with the aforesaid taxes.  All such tax payments shall be made payable directly to the order of the appropriate governmental officer or the Title Insurer.

19. **Brokerage**.  Purchaser and Seller represent and warrant to each other that this sale was not brought about by any broker and that no broker, finder or other party is entitled to a commission or other compensation or was instrumental or had any role in bringing about this sale.  Each party agrees that should any claim be made for a commission, finder's fee or other compensation, such party will hold the other party free and harmless from any and all claims, liabilities, losses, damages, costs or expenses including, without limitation, reasonable attorneys' fees and expenses, in connection with the falsity of the representation set forth above.  The provisions of this Section 19 shall survive the Closing or termination of this Agreement.  Notwithstanding anything to the contrary set forth herein, in the event any broker(s) claim to have dealt with Seller and/or the Prior Contract Vendee in connection with the Original Contract, Seller shall hold Purchaser free and harmless from any and all claims, liabilities, losses, damages, costs or expenses including, without limitation, reasonable attorneys' fees and expenses, in connection with any claim by such broker(s).

20. **Notices**.  All notices hereunder shall be in writing and shall be sent by email and by one of the following additional methods: (a) personal delivery against return receipt, (b) registered or certified mail, return receipt requested, postage prepaid, (c) facsimile transmission (receipt confirmed) or (d) reputable overnight courier, to the parties at the following addresses:

To the Seller:

177 Water Limited Partnership
50 Hudson Avenue
Brooklyn, New York 11201
Attn:   Christopher Masotto
Email:  masotto44@gmail.com

With a copy to:

Tarter Krinsky & Drogin LLP
1350 Broadway
New York, New York 10018
Attn: William W. Weisner, Esq.
Facsimile No.: 212-656-1190
Email:  wweisner@tarterkrinsky.com

To the Purchaser:

> ZB Pearl LLC
> 225 West 37th Street, 8th Floor
> New York, NY 10018
> Attn:   Cyson Wong and Danny Zelouf
> Email:  cyson@zbcapitalgroup.com and danny@zbcapitalgroup.com

with a copy to:

> Mashaal & Associates PLLC
> 245 Park Avenue, 39th Floor
> New York, NY 10167
> Attn:   David R. Mashaal, Esq.
> Email:  dmashaal@mashaallaw.com

or at such other address in the United States of America as may be designated by either of the parties in a written notice given in accordance with the provisions of this Section.  Any such notice shall be effective on the date of receipt or failure to accept receipt.  Either party's attorneys may give notice on behalf of their respective clients.  Any notice sent by facsimile must also be sent on the same day by one of the other methods permitted under the first sentence of this Section 20.

21. **Assignment**.    Neither this Agreement nor any of the rights of Purchaser hereunder (nor the benefits of such rights) may be assigned or encumbered without Seller's prior written consent, and any attempted or purported assignment or encumbrance without Seller's prior written consent shall be void.  Notwithstanding the foregoing, Purchaser may assign this Agreement and all the rights thereunder to an "Affiliate" (hereinafter defined), provided that such assignment does not delay the Closing and that there is delivered to Seller at or before the Closing (a) an original counterpart of a duly executed and acknowledged assignment by Purchaser of this Agreement and all of its rights hereunder and (b) a duly executed and acknowledged assumption by the assignee of this Agreement of all of the obligations of Purchaser hereunder.  The aforesaid assignment or the consent by Seller to an assignment by Purchaser shall not release Purchaser from the performance of the covenants to be performed by Purchaser under this Agreement nor shall such consent relieve the permitted assignee from obtaining Seller's prior written consent to any further assignment.  Solely for purposes of this Section 21, "**Affiliate**" shall mean an entity which controls, is controlled by, or is under common control with, Purchaser and/or Danny Zelouf and Jason Behfarin.  The term "**control**" shall mean, in the case of a corporation, ownership or voting control, directly or indirectly, of at least fifty (50%) percent of all the voting stock, and in the case of a joint venture or partnership or similar entity, ownership, directly or indirectly, of at least fifty (50%) percent of all the general or other partnership (or similar) interests therein.  Purchaser shall not "flip" this Agreement or resell the Property or any part thereof through a double-escrow arrangement (or similar arrangement) without Seller's prior written consent, which consent may be granted or withheld in Seller's sole discretion.  Purchaser shall inform Seller in writing of the exact name, address and place of formation of the entity to be named as grantee in the deed, at least 5 business days prior to Closing.  Notwithstanding the foregoing, under no circumstances shall Purchaser have the right to assign this Agreement or any of the rights of Purchaser hereunder (nor the benefits of such rights) to the Prior Contract Vendee or any of the Prior Contract Vendee's direct or indirect

members or immediate family members (except that such parties may be passive, minority members of any assuming entity as hereinbefore provided).

22. **Personal Property**.  The parties hereto agree that no part of the Purchase Price shall be deemed to have been paid by Purchaser for any Personal Property transferred hereunder.  Sales taxes, if any, payable by reason of the sale of any of the Personal Property shall be paid by Purchaser and Purchaser shall indemnify Seller with respect thereto.  The indemnity set forth in the preceding sentence shall survive Closing.

23. **Tax Certiorari Proceedings**.  Seller is hereby authorized to commence or continue any proceeding for the reduction of the assessed valuation of the Property for New York City fiscal years up to and including the New York City fiscal year in which the Closing occurs, and to try to settle the same in Seller's discretion (provided that if the proceeding is for the New York City fiscal year in which the Closing occurs, such settlement will not be made without Purchaser's consent, which consent shall not be unreasonably withheld or delayed); provided, however, that the net refund or credit of taxes, if any, for any tax year for which Purchaser shall be entitled to share shall be divided between Seller and Purchaser in accordance with the proportion which the period covered by such refund or credit in which the Property was owned by Seller bears to the entire period covered, after deducting therefrom a pro rata share of all expenses, including counsel fees, incurred in obtaining such refund or credit (the allocation of such expenses to be based upon the total refund or credit obtained in the proceeding and in any other proceeding simultaneously involved in the trial or settlement).  Purchaser shall deliver to Seller, upon demand, receipted tax bills and canceled checks used in payment of such taxes and shall execute any and all consents or other documents, and do any act or thing necessary for the collection of such refund or credit by Seller.  Any refunds or credits due for tax years prior to the New York City fiscal year in which the Closing occurs shall remain the sole property of Seller.  The provisions of this Section 23 shall survive the Closing.

24. **Casualty**.

(a) Seller and Purchaser waive the provisions of all applicable laws (including General Obligations Law Section 5-1311) relating to the occurrence of a casualty between the date hereof and the Closing, and agree that the following provisions with respect thereto shall govern.

(b) If the Property or any portion thereof shall be damaged by fire or other casualty between the date of this Agreement and the Closing and the cost of restoring and repairing the portion of the Property so damaged to substantially its present condition (the "**Restoration Cost**") is less than One Million and 00/100 ($1,000,000.00) Dollars as reasonably estimated by an architect or engineer selected by Seller and reasonably satisfactory to Purchaser, then Purchaser shall have no right to terminate this Agreement and shall purchase the Property in its damaged condition and assume full responsibility for repair thereto, without reduction of the Purchase Price or any other claim or offset.  Seller shall (i) assign to Purchaser the right to receive any insurance proceeds payable to Seller as a result of such fire or other casualty and (ii) credit to Purchaser at Closing an amount equal to the deductible on Seller's policy of hazard insurance, provided that (x) Seller shall be entitled to retain, to the extent theretofore paid, and shall not be obligated to assign the right to receive, to the extent not theretofore paid, an amount of such insurance proceeds equal to Seller's expenses incurred in collecting such proceeds and in protecting or restoring the Property and (y) the amount of any credit under clause (ii) above shall

not exceed the excess of the Restoration Cost for all restoration work remaining to be performed over the amount of insurance proceeds assigned.

(c) If the Property or any portion thereof shall be damaged by fire or other casualty between the date of this Agreement and the Closing and the Restoration Cost is more than One Million and 00/100 ($1,000,000.00) Dollars as reasonably estimated by an architect or engineer selected by Seller and reasonably satisfactory to Purchaser, then Purchaser shall have the option, to be exercised within fifteen (15) days from the date of delivery of a written estimate of the Restoration Cost, to terminate this Agreement by written notice to the other party (a "**Casualty Termination Notice**").  In such case neither party hereto shall have any further duties, obligations or liabilities to the other hereunder, except that Purchaser shall be entitled to the return of the Deposit, but not the Prior Deposit, and except for those obligations specifically provided for in this Agreement to survive the termination of this Agreement.  If neither Seller nor Purchaser shall elect to terminate this Agreement as provided above, then this Agreement shall remain in full force and effect and the provisions of underline subsections (b) or (d), as the case may be, of this Section 24 shall apply to such damage and restoration and any insurance proceeds payable in connection therewith.

(d) In no event shall Seller have any obligation to repair any damage to the Property resulting from fire or other casualty.

25. **Condemnation**.

(a) Seller and Purchaser hereby waive the provisions of all applicable laws (including General Obligations Law Section 5-1311) relating to the occurrence of a condemnation between the date hereof and the Closing, and Seller and Purchaser agree that the following provisions with respect thereto shall govern.  Seller agrees to notify Purchaser promptly if the Property shall be taken in whole or in part by right of eminent domain or condemnation prior to the Closing (a "**Taking**").

(b) If the Taking will so affect the Property as to (i) cause the Property to not comply with applicable laws, codes and regulations concerning zoning and land use or (ii) prevent the use of the Property for its current purposes, then Purchaser shall have the right to terminate this Agreement by giving written notice to Seller within fifteen (15) days of the date Seller sends written notice to Purchaser of the Taking.  In such case, neither party hereto shall have any further duties, obligations or liabilities to the other hereunder, except for those obligations specifically provided for in this Agreement to survive the termination of this Agreement, and Purchaser shall be entitled to the return of the Deposit, but not the Prior Deposit. If Purchaser does not so terminate this Agreement, or shall have no right to terminate this Agreement, then (x) this Agreement shall remain in full force and effect notwithstanding such Taking, (y) Purchaser shall purchase the Property in its then condition without reduction of the Purchase Price or any other claim or offset and (z) Seller shall assign to Purchaser at Closing the right to negotiate and receive any condemnation award payable to Seller as a result of the Taking, net of (A) any costs incurred by Seller in the process of litigating or negotiating the amount of, or collecting, the award and (B) any sums expended by Seller to restore or protect the Property as a result of the Taking.

(c) In no event shall Seller have any obligation to repair any damage to the Property resulting from a Taking.

26. **Information Sharing.**    After the Effective Date, Seller agrees to make available to Purchaser all material or information in Seller's possession as of the Effective Date and/or access to knowledgeable parties reasonably required by Purchaser in connection with Purchaser's inspection of the Property. Such material, information or access to knowledgeable parties shall include, without limitation, design professionals, expeditors, contractors and subcontractors, lease agreements, environmental reports, approvals, engineering reports, architectural studies and all site and building plans, permits, entitlements, zoning lot development agreements, and zoning approvals, correspondence with any governmental agencies, development cost information, construction estimates, agreements made with past and present occupants, stipulation agreements, settlement agreements, correspondence with tenants or tenants' counsel (including former tenants), legalization narrative, if any, legalization plan, if any, 10-year history of capital expenditures especially as it relates to legalization of units, documents related to past, current, or threatened litigation, documents related to previous tenants, previous uses, historical invoices related to the building, and the like. Seller shall pay at Closing, as a condition to Seller's obligation to close, Seller's reasonable out-of-pocket costs and expenses incurred in complying with this Section 26.

27. **Section 1031 Like-Kind Exchange.**

(a)    Seller, in lieu of the sale of the Property to Purchaser for the cash consideration herein, reserves the option to structure the sale of the Property as a like-kind exchange under Section 1031 of the Internal Revenue Code of 1986, as amended. At any time prior to closing, Seller may, with prior written notice to Purchaser, assign all of the rights under this Agreement to a "Qualified Intermediary" (as that term is defined in Treasury Regulation § 1.1031(k)-1(g)(4)) that will act as Seller's agent in order to effectuate a like-kind exchange provided that the assignment will not delay closing or increase Purchaser's costs. If Seller (or a constituent thereof) assigns its rights under this Agreement to a qualified intermediary, Purchaser agrees to, at the Closing, deposit, according to the terms of Article 2, the entire Purchase Price into a qualified escrow account or a qualified trust (as those terms are defined in Treasury Regulation § 1.1031(k)-l(g)(3)) as directed by Seller. If Seller elects to consummate this transaction as part of a like-kind exchange, Purchaser will have no obligation to acquire replacement property for Seller. Seller's assignment of its rights hereunder to a qualified intermediary, if any, shall not relieve Seller of any duties or obligations under this Agreement.

(b)    Purchaser reserves the option to structure the sale of the Property as a like-kind exchange under Section 1031 of the Internal Revenue Code of 1986, as amended. At any time prior to closing, Purchaser may, with prior written notice to Seller, assign all of the rights under this Agreement to a Qualified Intermediary that will act as Purchaser's agent in order to effectuate a like-kind exchange provided that the assignment will not delay closing or increase Seller's costs. If Purchaser assigns its rights under this Agreement to a qualified intermediary, Seller agrees to, at the Closing, convey the Property to the Qualified Intermediary designated by Purchaser. If Purchaser elects to consummate this transaction as part of a like-kind exchange, Seller will have no obligation to acquire replacement property for Purchaser. Purchaser's assignment of its rights hereunder to a qualified intermediary, if any, shall not relieve Purchaser of any duties or obligations under this Agreement.

28. **Cooperation**.

(a)        Seller has advised Purchaser that it may be necessary after the Closing for Seller (or its representatives) to audit the records with respect to the period prior to the Closing. In addition, Seller may require access to such records in connection with any litigation by or against Seller and its affiliates with respect to the Property for the period prior to the Closing, any tax audit, examination or challenge or similar proceeding, or any calculation of sums payable under <u>Section 5</u>. Accordingly, Purchaser hereby: (i) agrees to retain the records with respect to the period prior to the Closing for a period of three (3) years after the Closing or such additional period as may reasonably be requested by Seller; and (ii) grants Seller, its affiliates and their respective representatives access to the such records, and if necessary for such audit, the Property, after the Closing, at reasonable times and upon reasonable prior notice, for such purposes.

(b)        Purchaser agrees to cooperate with Seller, its affiliates and their respective representatives in connection with any such litigation or proceedings with respect to the Property, any such tax audit, examination or challenge or similar proceeding, or any such calculation of sums payable under <u>Section 5</u>, said cooperation to be at no material cost or expense to Purchaser. Seller shall cooperate with Purchaser in connection with the assignment of all transferable licenses and permits to Purchaser and the application for a procurement of replacements of any non-transferable licenses and permits.

(c)        The provisions of this <u>Section 29</u> shall survive the Closing.

29. **Indemnification Procedure**. Any claim for indemnification pursuant to this Agreement shall be subject to the following conditions:

(a)        In the event any claim shall be made or action or proceeding instituted by any person against a party to be indemnified pursuant to this Agreement (the "**Indemnitee**") for which indemnity may be sought, the Indemnitee will, with reasonable promptness, notify the party that agreed to indemnity (the "**Indemnitor**") and shall continue to give the Indemnitor reasonably prompt written notice of all developments in connection therewith within the Indemnitee's knowledge. The failure of the Indemnitee to perform or comply with any of the Indemnitee's obligations hereunder shall not affect the Indemnitor's obligations hereunder except to the extent of any actual prejudice to it therefrom.

(b)        The Indemnitor shall have the option of defending the claim, action or proceeding (collectively, an "**Action**"), at the Indemnitor's sole cost and expense, in the name of the Indemnitee, and shall have the right to designate an attorney to defend such Action, subject to the reasonable consent of such Indemnitee. The Indemnitor shall conduct all proceedings with respect to the Action with due diligence. The Indemnitee shall have the right to participate and be represented by counsel or other representative of the Indemnitee's choosing in any Action and all negotiations relative thereto. Fees of any counsel representing the Indemnitee shall be paid for entirely by the Indemnitee unless (a) the employment of such counsel has been authorized by the Indemnitor, (b) the Indemnitor shall not have employed counsel to assume the defense of the Action or (c) if there are defenses available to the Indemnitee which are not available to the Indemnitor, and which are in direct conflict with the rights, obligations or defenses of the Indemnitor. The Indemnitee shall fully cooperate with the Indemnitor and the Indemnitor's attorneys at all stages of such Action. The Indemnitee agrees to supply promptly to the Indemnitor and the Indemnitor's attorneys all papers, documents and evidence in the

Indemnitee's possession and such other information within the Indemnitee's knowledge pertinent to such Action. The Indemnitee agrees to produce at the appropriate place or places, at reasonable times, such witnesses under Indemnitee's control as may be requested by the Indemnitor or the Indemnitor's attorneys. In the event the Indemnitor does not exercise the Indemnitor's right to defend any such Action, the Indemnitee shall defend the same in good faith and with due diligence.

(c)    In the event indemnification is sought pursuant hereto, no claim shall be settled without the prior written consent of the Indemnitee, which shall not be unreasonably withheld, unless a full release in favor of the Indemnitee is obtained from the party asserting the claim. The provisions of this Section 29 shall survive the Closing.

### 30. **Notice of Pendency**.

Purchaser hereby irrevocably waives the right to file a notice of pendency (under Section 6501 of the New York Civil Practice Law and Rules or otherwise) other than in connection with any bona fide dispute, claim, action, or proceeding arising under or related to this Agreement and the transactions contemplated hereby. Purchaser's filing a notice of pendency (other than in connection with the filing of a simultaneous complaint) shall constitute a material breach by Purchaser entitling Seller to (a) terminate this Agreement, (b) demand and receive the Deposit from the Escrow Agent as liquidated damages for such breach (Purchaser agreeing that the amount of Seller's damages from the filing of such notice of pendency may be material and are difficult to quantify, and that the amount of the Deposit is a reasonable estimate of the possible damages that Seller may suffer therefrom), and (c) obtain a court order canceling the notice of pendency without posting any undertaking that might otherwise be required under Section 6515 of the New York Civil Practice Law and Rules or otherwise. If Purchaser files a notice of pendency for any reason except as expressly set forth above, Escrow Agent may rely on this waiver and shall have no liability whatsoever if Escrow Agent releases the Deposit to Seller, and Purchaser shall be deemed to have waived (x) any and all claims that Purchaser may have against Seller and Escrow Agent, and (y) any right to receive a return of the Deposit. The provisions of this Section 30 shall survive any termination of this Agreement.

### 31. **Miscellaneous**.

(a) This Agreement constitutes the entire agreement between the parties. This Agreement cannot be changed, modified, waived or terminated orally but only by an agreement in writing signed by the parties hereto. This Agreement shall be binding upon the parties hereto and their respective heirs, executors, personal representatives, successors and permitted assigns.

(b) This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same original, and the execution of separate counterparts by Purchaser and Seller shall bind Purchaser and Seller as if they had each executed the same counterpart, and copies of this Agreement distributed by fax or email shall be effective as originals for all purposes.

(c) This Agreement shall be construed and enforced in accordance with the laws of the State of New York.

(d) The headings used in this Agreement are for convenience only and do not constitute substantive matters to be considered in construing same.

(e) If either party hereto shall commence litigation against the other in connection herewith, the substantially non-prevailing party in such action shall reimburse the attorneys' fees of the substantially prevailing party in such action.

(f) Submission of drafts of this Agreement for examination or execution by Purchaser shall not bind Seller in any manner or be construed as an offer to sell, and no contract or obligation of Seller shall arise until this instrument is executed and delivered by both Seller and Purchaser and the Deposit has been received by the Escrow Agent.

(g) Any sums payable after the Closing by either party hereto to the other shall bear interest at the rate of nine percent (9%) per annum from the later of (i) the date the obligation to pay arises and (ii) ten days after demand is made for the payment, to the date of payment.  The provisions of this subsection (g) shall survive the Closing.

(h) Purchaser may not record this Agreement or any memorandum hereof, and any recordation or attempted recordation by Purchaser shall constitute a material default hereunder, giving Seller the right to terminate this Agreement and exercise any and all remedies of Seller set forth herein, or otherwise available at law or in equity.

(i)  No failure of any party to exercise any power given such party hereunder or to insist upon strict compliance by the other party with its obligations hereunder shall constitute a waiver of any party's right to demand strict compliance with the terms of this Agreement.

(j)  Seller and Purchaser each agree, at any time and from time to time at or after the Closing, to execute, acknowledge where appropriate, and deliver or cause to be executed, acknowledged and delivered such further instruments and documents and to take such other action as the other of them or the Title Company may reasonably request to carry out the intents and purposes of this Agreement. The provisions of this subsection (j) shall survive the Closing.

(k) THE RESPECTIVE PARTIES HERETO SHALL AND THEY HEREBY DO WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER ON ANY MATTERS WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT, OR FOR THE ENFORCEMENT OF ANY REMEDY UNDER ANY STATUTE, EMERGENCY OR OTHERWISE.  THE PROVISIONS OF THIS SUBSECTION (k) SHALL SURVIVE THE CLOSING OR EARLIER TERMINATION OF THIS AGREEMENT.

(l)  The rights and obligations of the parties hereto shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors, assigns, heirs and the legal representatives of their respective estates.  Nothing in this Agreement is intended to confer any right or remedy under this Agreement on any person other than the parties to this Agreement and their respective successors and permitted assigns, or to relieve or discharge the obligation or liability of any person to any party to this Agreement or to give any person any right of subrogation or action over or against any party to this Agreement.

(m) If any term or provision of this Agreement is determined to be illegal, unconscionable or unenforceable, all of the other terms, provisions and sections hereof will nevertheless remain effective and be in force to the fullest extent permitted by law.

(n) The parties hereto agree that no press or other publicity release or communication to the general public concerning the transactions contemplated by this

Agreement shall be issued by any party without Purchaser's and Seller's prior written approval prior to the Closing, unless same is required by governmental authorities. Seller and Purchaser covenant and agree not to communicate the terms or any aspect of this Agreement and the transactions contemplated hereby to any person or entity and to hold, in the strictest confidence, the content of any and all information in respect of the Property which is supplied by Seller to Purchaser or by Purchaser to Seller (collectively, the "**Information**"), without the express written consent of the other party; provided, however, that either party may, without consent, disclose the Information (a) to its respective advisors, consultants, attorneys, accountants, title insurer, partners, investors, employees and lenders (the "**Transaction Parties**") without the express written consent of the other party, and (b) if disclosure is required by law or by regulatory or judicial process. If this Agreement is terminated, such confidentiality shall be maintained and Seller, Purchaser and the Transaction Parties will destroy or deliver to Seller or Purchaser, as applicable, upon request, all documents and other materials, and all copies thereof, obtained thereby in connection with this Agreement that are subject to such confidence, with any such destruction confirmed by Seller or Purchaser, as applicable, and the Transaction Parties in writing. The foregoing confidentiality obligations shall not apply to the extent that any such information is a matter of public record or is provided in other sources readily available to the real estate industry other than as a result of disclosure by Seller or Purchaser, or is necessary to enforce the obligations of the other party under this Agreement. Subsequent to Closing, the provisions of this underline(n) shall no longer be applicable. The provisions of this underline(n) shall survive any termination of this Agreement.

(o) The provisions of this Section 31 shall survive the Closing or any termination of this Agreement.

32. **Assignment of Mortgage**. Upon Purchaser's request made at least 20 days before the Closing, Seller shall cooperate with Purchaser in arranging for the holder of the Seller's existing mortgage to assign such mortgage to Purchaser's lending institution. As sole consideration for Seller's cooperation with such assignment, Purchaser shall pay all customary attorney fees or other charges charged by the Seller's lending institution or its attorneys in connection with preparing and delivering such assignment of mortgage; provided that if the Prior Contract Vendee's confirmed plan of reorganization does not provide for an exemption for the NYC real property transfer tax and the NYS real estate transfer tax, then Purchaser shall pay to Seller at the Closing an amount equal to 25% of the net mortgage recording tax savings realized by Purchaser from the assignment of the mortgage.

[No further text on this page]

IN WITNESS WHEREOF, this Agreement has been entered into as of the Effective Date.

SELLER:

**177 WATER LIMITED PARTNERSHIP**

By: _Melanie Masotto_
Name: Melanie Masotto
Title: General Partner

PURCHASER:

**ZB PEARL LLC**

By: _[signature]_
Name: Danny Zelouf
Title: Authorized Signatory

{Client 084986 2 02234181.DOC;7 }

## **EXHIBIT A**

## DESCRIPTION OF LAND

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Brooklyn, County of Kings, City and State of New York, bounded and described as follows:

BEGINNING at a point on the easterly side of Pearl Street, distant 102 feet 6 inches southerly from the corner Formed by the intersection of the easterly side of Pearl Street with the southerly side of Plymouth Street;

RUNNING THENCE easterly parallel with Plymouth Street and through a party wall, 91 feet 2 1/2 inches;

THENCE southerly, almost parallel with Pearl Street and through a party wall, 47 feet 1 inch;

THENCE westerly parallel with Plymouth Street and through a party wall, 91 feet 2 1/2 inches to the easterly side of Pearl Street;

THENCE northerly along the easterly side of Pearl Street, 47 feet 1 inch to the point or place of BEGINNING.

## EXHIBIT B

## PERMITTED EXCEPTIONS

1.      Zoning regulations, ordinances, and requirements adopted by any governmental or municipal authority having jurisdiction thereof, and amendments and additions thereto now in force and effect, which relate to the Property.

2.      Encroachments of stoops, areas, cellar steps, trim cornices, lintels, window sills, awnings, canopies, fences, ledges, coping and retaining walls on adjoining properties upon the Property and encroachments of similar elements on the Property on adjoining properties and streets; and minor variations between tax lot lines and lines of record title (provided the same do not result in any out of possession claims).

3.      Rights of utility companies to lay, maintain and repair pipes, lines, conduits, cable boxes and other installations on, under and across the Property and any rights, easements and licenses in favor of, or agreements with, any public utility company, including but not limited to, gas, electricity, telephone, telegraph and cable television services and private sewer agreements, if any.

4.      All notes or notices of or violations of law or municipal ordinances, orders or requirements noted in or issued by any state or municipal departments having jurisdiction, now or hereafter against or affecting the Property (subject to adjustment for violations, penalties and interest in a liquidated amount as provided for in this Agreement)..

5.      Subject to adjustment as herein provided, real estate taxes, tax liens, water and sewer charges, assessments and vault charges, and the liens of any of the foregoing.

6.      Consents by Seller or any former owner of the Property for the erection of any structure or structures on, under or above any street or streets on which the Property may abut.

7.      Possible lack of right in the seller to maintain vaults, vault lights, coal chutes or excavations beyond the building line, whether above or below the sidewalk.

8.      The standard exclusions and provisions contained in the form of insuring agreement employed by the title insurer.

9.      The existence of possible party walls.

10.     Such other liens, claims, encumbrances, exceptions and matters as any reputable title insurance company authorized to do business in the State of New York shall be willing to (A) omit as exceptions to coverage or (B) except with insurance against collection out of or enforcement against the Property with respect to Purchaser's insurance policy, and omit as exceptions to coverage with respect to any lender's mortgage insurance policy, in either case without additional payment or premium required to be made by Purchaser, unless Seller elects to pay such additional payment or premium at Seller's sole cost and expense.

11.     Right of Way easement recorded in Reel 4770, Page 2025.

12.     Reservations recorded in Liber 6380, Page 512 and Liber 8133, Page 69.

## EXHIBIT C

## FORM BARGAIN AND SALE DEED WITHOUT
## COVENANT AGAINST GRANTOR'S ACTS

 **THIS INDENTURE,** made as of the ____ day of _____, 202_, between 177 WATER LIMITED PARTNERSHIP, a limited partnership organized under the laws of the State of Delaware, having an address at 50 Hudson Avenue, Brooklyn, New York 11201, party of the first part, and

 ZB PEARL LLC, a limited liability company organized under the laws of the State of New York, having an address at 225 West 37th Street, New York, NY 10018, party of the second part,

 **WITNESSETH,** that the party of the first part in consideration of Ten Dollars ($10.00) and other good and valuable consideration, paid by the party of the second part, does hereby grant and release unto the party of the second part, the heirs or successors and assigns of the party of the second part forever,

 **ALL** that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Borough of Brooklyn, County of Kings, City and State of New York, bounded and described as follows:

BEGINNING AT A POINT ON THE EASTERLY SIDE OF PEARL STREET DISTANT 102 FEET 6 INCHES SOUTHERLY FROM THE CORNER FORMED BY THE INTERSECTION OF THE EASTERLY SIDE OF PEARL STREET WITH THE SOUTHERLY SIDE OF PLYMOUTH STREET;

RUNNING THENCE EASTERLY PARALLEL WITH PLYMOUTH STREET AND THROUGH A PARTY WALL, 91 FEET 2 1/2 INCHES;

THENCE SOUTHERLY ALMOST PARALLEL WITH PEARL STREET AND THROUGH A PARTY WALL, 47 FEET 1 INCH;

THENCE WESTERLY PARALLEL WITH PLYMOUTH STREET AND THROUGH A PARTY WALL, 91 FEET 2 1/2 INCHES TO THE EASTERLY SIDE OF PEARL STREET;

RUNNING THENCE NORTHERLY ALONG THE EASTERLY SIDE OF PEARL STREET 47 FEET 1 INCH TO THE POINT OR PLACE OF BEGINNING.

 **TOGETHER** with all right, title and interest, if any, of the party of the first part in and to any streets and roads abutting the above described premises to the center lines thereof,

 **TOGETHER** with the appurtenances and all the estate and rights of the party of the first part in and to said premises,

***TO HAVE AND TO HOLD*** the premises herein granted unto the party of the second part, the heirs or successors and assigns of the party of the second part forever.

***AND*** the party of the first part, in compliance with Section 13 of the Lien Law, covenants that this conveyance is subject to the trust fund provisions and such consideration for this conveyance as a trust fund is to be applied first for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose.

The grantor herein is the same person as the grantee in the deed recorded in Reel 4770, page 2025 at the office of the Register of the City of New York, Kings County.

The premises described herein are part of the same and intended to be part of the same as those described in the deed recorded in Reel 4770, page 2025 at the office of the Register of the City of New York, Kings County, as corrected.

The word "party" shall be construed as if it read "parties" whenever the sense of this indenture so requires.

[NO FURTHER TEXT ON THIS PAGE.  SIGNATURE PAGE FOLLOWS.]

**IN WITNESS WHEREOF,** the party of the first part has duly executed this deed as of the day and year first above written.

177 WATER LIMITED PARTNERSHIP

By: _____

Melanie Masotto, General Partner

ACKNOWLEDGEMENT TAKEN OUTSIDE NEW YORK STATE

State of Florida, County of _____ ss:

On the _____ day of _____ in the year 202_, before me, the undersigned personally appeared Melanie Masotto, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, that by her signature on the instrument, the individual or the person upon behalf of which the individual acted, executed the instrument, and that such individual made such appearance before the undersigned in _____.
(Insert city or political subdivision and state or county or other place acknowledgment taken).

_____

(Signature and office of individual taking acknowledgment)

| | |
|---|---|
| 177 Water Limited Partnership<br><br>To<br><br>ZB PEARL LLC | BLOCK: 30<br><br>LOT: 4<br><br>COUNTY: Kings<br><br>STREET ADDRESS:  53 Pearl Street,<br>                              Brooklyn, New York |

**Return By Mail To:**

**This Space Reserved For Use Of Recording Office**

## EXHIBIT D

### FORM OF BILL OF SALE

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, 177 Water Limited Partnership, a Delaware limited partnership (the "**Seller**"), hereby grants, bargains, sells, transfers, assigns, and conveys to ZB Pearl LLC, a New York limited liability company (the "**Purchaser**"), all of Seller's right, title and interest to all personal property (whether tangible, intangible or otherwise) now at, in or upon or used in connection with the Property located at 53 Pearl Street, Brooklyn, New York (the "**Land**") including, without limitation, all tangible personal property upon the Land or within the improvements located thereon, including specifically, without limitation, appliances, furniture, carpeting, draperies and curtains, tools and supplies, and other items of personal property, (excluding cash and accounts receivable) related to, used in connection with, or required for the operation of the Land and the improvements, but excluding any business and trade fixtures, machinery, and equipment belonging to any tenant of the building in their capacity solely as tenant and located within the space leased to that tenant and all materials that are used or useful in the leasing and marketing of the Property (collectively, the "**Personal Property**"), but specifically excluding from the Personal Property all property owned by tenants, if any, to have and to hold the Personal Property unto Purchaser, its successors and assigns, forever.

Seller grants, bargains, sells, transfers and delivers the Personal Property in its "AS IS" condition, WITH ALL FAULTS, IF ANY, and makes no representations or warranties, direct or indirect, oral or written, express or implied.

EXECUTED as of the day and year first above written.

**SELLER:**

**177 WATER LIMITED PARTNERSHIP**


By: _____
Name:
Title:

<u>**EXHIBIT E**</u>

<u>FORM OF GENERAL ASSIGNMENT AND ASSUMPTION AGREEMENT</u>

KNOW ALL MEN BY THESE PRESENTS:

THIS GENERAL ASSIGNMENT AND ASSUMPTION AGREEMENT (this "**Assignment**") is made and entered into as of the _____ day of _____, 202_ by 177 Water Limited Partnership ("**Assignor**"), a Delaware limited partnership, having an address at 50 Hudson Avenue, Brooklyn, New York 11201 and ZB Pearl LLC ("**Assignee**"), a New York limited liability company, having an address at 225 West 37th Street, New York, NY 10018.

W I T N E S S E T H:

WHEREAS, Assignee is purchasing from Assignor and Assignor is conveying to Assignee that certain real property located at 53 Pearl Street, Brooklyn, New York (the "**Property**") pursuant to that certain Purchase and Sale Agreement (the "**Contract**") dated as of November _____, 2020 between Assignor and Assignee; and

WHEREAS, Assignor in connection with such conveyance, Assignor is conveying to Assignee: (i) all transferable or assignable licenses, permits, registrations, certificates, authorizations and governmental approvals obtained in connection with the design, construction, rehabilitation, use and/or operation of the Property, if any; (ii) trademark rights, and other intangible property, rights, titles, interests, privileges and appurtenances related to or used in connection with the Property or its operations, if any; and (iii) warranties and guaranties of architects, engineers, contractors, subcontractors, suppliers or materialmen involved in the repair, construction, maintenance, design, reconstruction or operation of the Property, or of any equipment or system constituting a part of the Real Property (as defined in the Contract), if any (collectively, the "**Intangible Property**").

NOW, THEREFORE, for and in consideration of the sum of Ten and No/100 Dollars ($10.00), the receipt and sufficiency of which is hereby acknowledged and confessed:

1.      Assignor hereby assigns and transfers to Assignee, its successors and assigns, all of the right, title, and interest of Assignor in and to the Intangible Property.

2.      From and after the date hereof, Assignee hereby affirmatively and unconditionally assumes the obligations of the Assignor with respect to the Intangible Property

and indemnifies and holds harmless Assignor for all claims and liabilities thereunder arising from and after the date hereof.

       3.      Except as expressly set forth in the Contract and subject to the limitations therein, this Assignment is made without warranty, representation, or guaranty by, or recourse against, Assignor of any kind whatsoever.

       4.      This Assignment shall be binding upon, and inure to the benefit of, all of the parties hereto, their successors and assigns.

[Signature Page follows]

EXECUTED as of the day and year first above written.

<u>ASSIGNOR:</u>

**177 WATER LIMITED PARTNERSHIP**

By: _____
Name:
Title:


ASSIGNEE:

**ZB PEARL LLC**

By: _____
Name:
Title:

**EXHIBIT F**

FORM OF TITLE AFFIDAVIT

State of _____)                    Title No:
                     ) ss:                    Premises: 53 Pearl Street, Brooklyn, NY
County of  _____)

Melanie Masotto, being duly sworn, deposes and says:

1. **IDENTIFICATION:**

   I am the General Partner of the limited partnership known as 177 Water Limited Partnership ("Seller") which is conveying premises known as 53 Pearl Street, Brooklyn, NY.

2. **TENANCY:**

   There are presently no tenants in said premises.

3. **WORK BY CITY OF NEW YORK:**

   No work has been done on the above premises by or on behalf of the City of New York, nor has any demand been made by the City of New York for any such work that would result in charges or fees by the City of New York Department of Rent and Housing Maintenance Emergency Services, the New York City Department of Environmental Protection, the New York City Department of Health, or any other agency or department of the City of New York.  No inspection fees, permit fees, elevator(s), sign, boiler or other charges have been levied, charged, created or incurred that may become a tax or lien pursuant to the Administrative Code of the City of New York.

4. **IMPROVEMENTS:**

   No additions, alterations or improvements are now being made or have been made to the premises within the last nine (9) months.

5. **JUDGMENTS:**

   To the knowledge of the undersigned, there are no judgments filed against Seller in any Court of this state or any other state, except for ECB judgment no. 35055382K, dated 11/14; ECB judgment 35057045Z, dated 02/15; and ECB judgment 34973297M, dated

01/15, all of which Seller shall adjust with the purchaser of the premises, or at the direction of purchaser, deposit with purchaser's title company funds sufficient to pay the same in full.

**6. FEDERAL/STATE TAX LIENS:**

To the knowledge of the undersigned, there are no federal or state tax liens or claims assessed or filed against Seller in this or any other state.

**7. BANKRUPTCY/CREDITORS:**

No proceeding in Bankruptcy has been instituted by or against Seller in any Court or before any officer of any state or of the United States, nor has Seller at any time made an assignment for the benefit of creditors of any assignment, now in effect, of the rents of said premises or any part thereof.  There is a pending Chapter 11 proceeding filed by a former contract vendee of the property in respect of itself.

**8. CERTIFICATION OF TITLE:**

Seller is the same as the grantee in a deed dated October 25, 1999 and recorded February 17, 2000 in Reel 4770, page 2025 at the office of the Register of the City of New York, Kings County.

**9. ORGANIZATIONAL DOCUMENTS; AUTHORITY:**

All organizational documents provided (including, without limitation, any partnership agreements, certificates of limited partnership, resolutions and written consents) with respect to Seller and any beneficial owner(s) thereof, are true, correct and complete in all material respects including any and all amendments or modifications thereto.  The person(s) executing the closing instruments had, at the time of such execution, the authority to bind Seller.

**10. RIGHTS OF THIRD PARTIES:**

No one other than the purchaser of the premises has any unexpired rights or options to purchase, lease or occupy the premises.

**11. REPRESENTATIONS:**

All representations required to be made pursuant to the terms of the contract of sale for the premises, as the same has been amended, are hereby confirmed and deemed made as of the date of closing.

**[Remainder of page intentionally left blank]**

[Seller's Title Affidavit – Signature Page]

_____
Melanie Masotto

Sworn to before me this

_____ day of _____, 202_.


_____
Notary Public